[No. A091134. First Dist., Div. One. Mar. 5, 2001.]

ROSE M. BELL et al., Plaintiffs and Respondents, v.
FARMERS INSURANCE EXCHANGE, Defendant and Appellant.

806

**COUNSEL**

Horvitz & Levy, Ellis J. Horvitz, Barry R. Levy, Jon B. Eisenberg; Winston & Strawn, Lee T. Paterson, Laura R. Petroff and Jessie A. Kohler for Defendant and Appellant.

Rudy, Exelrod, Zieff & True, Steven G. Zieff and Marcie E. Berman for Plaintiffs and Respondents.

## OPINION

**SWAGER, J.**—In this class action lawsuit to recover for nonpayment of overtime compensation, the defendant, Farmers Insurance Exchange (hereafter FIE), appeals an interim order awarding attorney fees, which was entered following an order granting summary adjudication in favor of plaintiffs on defendant's fourth affirmative defense. We find no error in the decisional underpinning of the award but reverse it on statutory grounds.

### PROCEDURAL BACKGROUND

FIE is one of a group of affiliated insurance companies doing business under the service name of Farmers Insurance Group of Companies. The Personal Lines Division of the company issues automobile insurance policies and homeowners policies to private individuals in California. Claims arising in California from these policies, as well as from similar policies issued by other affiliated companies, are normally processed by claims representatives working in some 70 branch claims offices in the state. Employees in these branch claims offices, including clerical and supervisory employees as well as claims representatives, constitute the majority of FIE's workforce in California. Though claims representatives regularly work over 40 hours a week, FIE does not pay overtime on the ground that these employees are exempt from the wage and hour laws.

Plaintiffs are former and current FIE claims representatives who worked in the California branch claims offices of the Personal Lines Division from October 1, 1993, to the present. They brought this class action on behalf of themselves and other California claims representatives, seeking damages for unpaid overtime compensation and other relief. Accepting their request for class certification, the trial court certified three subclasses of employees who worked for FIE during the relevant period and were assigned to handle property, automobile physical damage and liability claims.

Following completion of discovery, plaintiffs filed a motion for summary adjudication of FIE's fourth affirmative defense to the first amended complaint. That motion sought a ruling on plaintiffs' exempt status under California wage and hour law. In an order entered April 21, 1999, the trial court granted the motion for summary adjudication, which it described as presenting the issue whether personal lines claims representatives are "administrators" exempt from overtime pay. The court found: "that there is no

triable controversy and that claims adjusting is a product or service which FIE's operation exists to provide. It is further found that the Personal Lines Claims Representatives devote their time to carrying out FIE's claims adjusting product/service as opposed to its 'administrative' functions. Therefore, as a matter of law, these Personal Lines Claims representatives . . . do not fall within the ambit of the 'administrative' exemption from overtime . . . ."

Plaintiffs subsequently moved for an interim award of attorney fees and costs pursuant to Labor Code sections 218.5 and 1194, subdivision (a). Granting plaintiffs' motion, the trial court awarded interim attorney fees of $1,238,116.50, finding that plaintiffs "prevailed on liability issues." FIE now appeals from the order awarding attorney fees as a collateral final order (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 369 [134 Cal.Rptr. 197, 556 P.2d 297]) and asks us to review the summary adjudication order pursuant to Code of Civil Procedure section 906.

## DISCUSSION

### A. *Administrative Employee Exemption*

FIE first attacks the interim order awarding attorney fees on the ground that its decisional underpinning—the order of summary adjudication on its fourth affirmative defense—was erroneous. The affirmative defense was predicated on the claim that plaintiffs come within an exemption from the overtime compensation requirements of the Industrial Welfare Commission (IWC) applying to "persons employed in administrative . . . capacities." As applied to the insurance industry, the pertinent exemption appears in subdivision 1(A) of the IWC's wage order No. 4, codified in California Code of Regulations,[1] title 8, section 11040, subdivision 1(A). We will first consider issues relating to the statutory context of subdivision 1(A) and then examine the relevance of federal law in its interpretation.

### 1. *Statutory Context of Term "Administrative Capacities"*

The IWC has promulgated 15 wage orders, applying to separate industries, which each follow a similar format. Wage order No. 4 applies broadly to "Professional, Technical, Clerical, Mechanical, and Similar Occupations." As in the case of other wage orders, subdivision 1 of title 8, section 11040, addresses the coverage of the wage order and sets forth the exemption at issue here in subdivision 1(A):

"1. Applicability of Order. This Order shall apply to all persons employed in professional, technical, clerical, mechanical, and similar occupations

---

[1]Hereafter all references to title 8 will be to the California Code of Regulations.

whether paid on a time, piece rate, commission, or other basis, unless such occupation is performed in an industry covered by an industry order of this Commission, except that:

"(A) Provisions of sections 3 through 12 shall not apply to persons employed in administrative, executive, or professional capacities. No person shall be considered to be employed in an administrative, executive, or professional capacity unless one of the following conditions prevails:

"(1) The employee is engaged in work which is primarily intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment, and for which the remuneration is not less than $1150.00 per month; or

"(2) The employee is licensed or certified by the State of California and is engaged in [the practice of a profession such as law or medicine]."

We begin by noting that wage order No. 4 is a quasi-legislative regulation subject to normal principles of statutory interpretation. It was promulgated by the IWC under the authority of 1913 legislation directing it to provide for a "minimum wage" for women and children. (Stats. 1913, ch. 324, § 6, pp. 632-635; Cal. Const., art. XX, former § 17½.) In the early 1970's, the federal courts invalidated a substantial portion of IWC regulations on the ground that the limited application to adult women workers violated the prohibition on sex discrimination in title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.).[2] In response, the Legislature enacted new enabling legislation in 1973. (See Lab. Code, §§ 1173 & 1178.) The constitutionality of this legislation was confirmed by enactment of California Constitution, article XIV, section 1. Our high court observed that "the 1973 legislation did not alter the basic nature of the IWC's decision-making authority . . . ." (*Industrial Welfare Com. v. Superior Court, supra,* 27 Cal.3d at p. 701.) In particular, "[j]udicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion." (*Id.* at p. 702.)

█ FIE maintains that our analysis of the administrative exemption should be governed by the rule that, " '[i]f statutory language is "clear and unambiguous there is no need for construction, and courts should not indulge in it." [Citation.]' [Citation.]" (*Birbrower, Montalbano, Condon & Frank v.*

---

[2]See *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700-701 [166 Cal.Rptr. 331, 613 P.2d 579].

*Superior Court* (1998) 17 Cal.4th 119, 131-132 [70 Cal.Rptr.2d 304, 949 P.2d 1].) In its view, the scope of the administrative exemption in title 8, section 11040, subdivision 1(A) is clearly and comprehensively defined in subparts (1) and (2). Only subpart (1) applies to the present case. Focusing on the word "unless" in subdivision 1(A), FIE argues that the interpretation of subpart (1) is governed by the principle of *expressio unius est exclusio alterius.* (See *People v. Anzalone* (1999) 19 Cal.4th 1074, 1078 [81 Cal.Rptr.2d 315, 969 P.2d 160].) Under this principle of statutory interpretation, it reasons that, if the conditions of subpart (1) are necessary conditions to subdivision 1(A) (as the word "unless" implies), it may be inferred that they are the only conditions to the exemption. We disagree.

The substantive import of title 8, section 11040, subdivision 1(A)(1) does not suggest that it is intended to provide the sole criteria for determining if an employee is in an administrative, executive, or professional capacity. The very brief description of duties ("primarily intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment") and the standard of remuneration ("not less than $1150.00 per month") cannot reasonably be considered to be an adequate definition of the phrase "administrative, executive, or professional capacities." But they do make sense as establishing particular limitations on the scope of the phrase. Thus, the standard of remuneration does not contribute meaningfully to a definition of "administrative, executive, or professional capacities," but does serve as an outside parameter; an employee earning less than this amount, despite whatever other job duties he/she may have, will not qualify as an exempt employee. Also, the terms "intellectual, managerial, or creative" lack any direct defining relationship to the phrase "administrative, executive, or professional capacities," or any particular term in the phrase, but a job lacking any of these characteristics will fall outside the scope of the phrase.

In our view, it is more reasonable to give the term "administrative capacity" in title 8, section 11040, subdivision 1(A) an independent meaning, defining the breadth of the exemption in conjunction with the criteria of subparts (1) and (2) of the subdivision. This interpretation is favored by authority holding that, "under California law, exemptions from statutory mandatory overtime provisions are narrowly construed." (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794 [85 Cal.Rptr.2d 844, 978 P.2d 2]; *Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562 [38 Cal.Rptr.2d 221].) Such a narrow construction would give effect to any limitations implied by the term "administrative capacity" in subdivision 1(A) in addition to those limitations imposed by subparts (1) and (2) of the subdivision.

This reading is most consistent with the principle that, " ' "[i]n analyzing statutory language, we seek to give meaning to every word and phrase in the

statute to accomplish a result consistent with the legislative purpose . . . ." ' [Citation.]" (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641]; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

The principle of giving meaning to every word in the statute acquires a compelling logic in the present case because the reference to "administrative, executive, or professional capacities" in title 8, section 11040, subdivision 1(A) was added to wage order No. 4 *after* the provisions of subpart (1) of the subdivision. As we will explain in our examination of the regulatory history, the conditions in subpart (1) may be traced to a 1947 amendment, but the first sentence in subdivision (1)(A) adding the reference to "women employed in administrative, executive, or professional capacities" was added in a 1957 amendment.[3] Whatever may have been the legislative intent behind the 1957 amendment, it is clear that the IWC assigned significance to the terms "administrative, executive, or professional capacities." The legislative history does not permit us to adopt an interpretation of the exemption that effectively reduces these terms to surplusage. (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 921 [16 Cal.Rptr.2d 226, 844 P.2d 545]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

These principles of interpretation persuade us that we may properly inquire whether, and in what manner, the scope of the exemption is affected by the meaning of the term "administrative capacity."[4]

2.  *Relevance of Federal Law*

Having concluded that the principles of statutory interpretation allow us to give the term "administrative" in title 8, section 11040, subdivision 1(A) a meaning independent of the limitations of subparts (1) and (2) of the subdivision, we turn next to the relevance of federal law in construing the term. The question, we think, may be best approached by first reviewing the evolution of wage order No. 4 and its federal counterparts.

---

[3] See pages 813-814, *post.*

[4] We reject FIE's suggestion that the meaning of this term may be found in the language of title 8, section 11040, subdivision 1 referring to "professional, technical, clerical, mechanical, and similar occupations" as defined further in subdivision 2(C). This language is poorly adapted to serve the purpose of a definition of the term "administrative" and is obviously intended to state the broad application of wage order No. 4 as a whole. Moreover, as we will see in our examination of the legislative history, the language (with the exception of the word "mechanical") predates the introduction of the term "administrative" in the regulation and therefore cannot be read as intended to define that term.

Prior to 1947, the IWC wage orders, including wage order No. 4, contained no exemption from overtime requirements for administrative employees.[5] The minutes of an IWC meeting on March 7, 1947, record that the commission received testimony "that the inclusion of executive, administrative and professional women within the coverage of the orders prevented these employees from having the necessary freedom of action required for advancement in such positions. Therefore the Commission concluded that women holding such positions be exempted from coverage and standards were set for the determination of bona fide executive, administrative, or professional employment, *using Federal criteria as a guide*." (Italics added.)[6]

Following the meeting, the IWC adopted amendments to wage orders applying to nine industries that specifically exempted "women employed in administrative, executive, or professional capacities" and described the duties of such women employees in language drawn from federal regulations.[7] The amendment to wage order No. 4, however, did not contain the reference to "administrative, executive, or professional capacities" found in the other nine wage orders, perhaps because the industrial class, "[p]rofessional, technical, clerical and similar occupations," was then defined by title 8, former section 11346, subdivision (c), in a way that appeared to exclude these categories of employees. Nevertheless, the pertinent provision in wage order No. 4, former section 11345, was amended to include the same description of the duties of exempt employees, drawn from federal regulations, as that of the other nine wage orders. Effective June 1, 1947, former section 11345 provided: "the provisions of this Order shall not apply to women employed where one of the following conditions prevails: [¶] (a) The employee is engaged in work which is *predominantly intellectual, managerial*, or *creative*; which requires *exercise of discretion and independent judgment*; and for which the remuneration is not less than $250 per month; or [¶]

[5]The pertinent provision of wage order No. 4, title 8, former section 11345 (the predecessor of § 11040), did contain an exemption for professional employers, but this limited exemption was not found in other wage orders. Section 11345 then provided: "All provisions of this Order shall apply to all women and minor employees employed in technical, clerical and similar occupations by any employer, whether on a time, piece rate or other basis of pay. The provisions of Section 11347 shall not apply to women and minors employed in professional occupations."

[6]The Report of the Division of Industrial Welfare for the Governor's Council for March 1947 similarly states, "Women employed in administrative, executive or professional capacities are exempted from all of the orders." (Cal. Dept. Industrial Relations, Rep. for Governor's Council (Mar. 1947) p. 13.)

[7]See article 3, Amusement and Recreation Industries; article 4, Canning and Preserving Industries; article 5, Industries Handling Farm Products After Harvest; article 6, Laundry, Dry Cleaning and Dyeing Industry; article 7, Manufacturing Industry; article 8, Mercantile Industry; article 11, Personal Service Industry; article 13, Public Housekeeping Industry; and article 15, Transportation Industries.

(b) The employee is . . . [licensed in a designated profession] . . . ."[8] (Italics added.)

In 1957, as part of a recodification of wage order No. 4, the description of *industrial occupations included within the category of* "professional, technical, clerical and similar occupations" was greatly expanded, and title 8, former section 11345 was amended to insert the phrase "administrative, executive, or professional capacities"[9] in front of the description of the *duties of exempt employees added by the 1947 amendment.* The triad of terms, "administrative, executive, or professional," now included in wage order No. 4 as well as other wage orders, plainly borrowed from parallel language in section 13(a) of the federal Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq. (FLSA)), which then provided that the act "shall not apply with respect to—(1) any employee employed in a bona fide executive, administrative, or professional capacity . . . ." The minor variation in language—the change in the order of the terms and omission of the adjective "bona fide"—does not appear to signify a difference of substance.

Title 8, former section 11345 was amended in 1973 to apply to all employees rather than only to women and children and was later recodified as title 8, section 11040, but, in other respects, it underwent only minor changes in the decades after 1957. It was not until after summary judgment was granted in this case that section 11040 was again revised in a more significant way through an amendment, effective June 30, 2000, which we will consider later in this opinion.

█ In our view, this regulatory history supports the use of federal authorities as an aid to interpretation of the administrative exemption of title 8, section 11040, subdivision 1(A). A distinct degree of modeling after federal regulations is apparent in language describing the duties of

---

[8]In 1947, 29 Code of Federal Regulations (hereafter C.F.R.) part 541.3 defined the term "professional" as referring to any employee engaged in work "(1) *predominantly intellectual* and varied in character . . . and (2) requiring the consistent *exercise of discretion and judgment* in its performance . . ." or, alternatively, as referring to employees engaged in work "*predominantly* original and *creative* in character in a recognized field of artistic endeavor . . . ." Part 541.2 of 29 C.F.R. defining "administrative employees" contained four references to "*discretion and independent judgment.*" The definition of "executive employee" in 29 C.F.R. part 541.1 described duties relating to "management."

[9]As amended on November 15, 1957, title 8, former section 11345, subdivision (b), provided: "The provisions of Sections 3 through 12 shall not apply to women employed in administrative, executive, or professional capacities. No woman shall be considered to be employed in an administrative, executive, or professional capacity unless one of the following conditions prevails: [¶] (1) The employee is engaged in work which is predominantly intellectual, managerial, or creative; and which requires exercise of discretion and independent judgment; and for which the remuneration is not less than $350 per month; or [¶] (2) The employee is licensed . . . [in a designated profession] . . . ."

exempt employees introduced in the 1947 amendments to wage order No. 4 and corresponding provisions of other wage orders. A more obvious modeling is manifest in the use of the expression "administrative, executive, and professional capacities" added to nine wage orders by the 1947 amendment and included in wage order No. 4 by the 1957 amendment. To the extent that the language of these amendments is patterned after federal statutes and regulations, federal law becomes relevant to interpretation.

The relevance of federal law in construing IWC wage orders finds further confirmation in the interpretative letters of the Department of Labor Standards Enforcement (DLSE). ■ "As a general rule, the courts defer to the agency charged with enforcing a regulation when interpreting a regulation because the agency possesses expertise in the subject area." (*Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 28 [285 Cal.Rptr. 515]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 21 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) The DLSE " 'is the state agency empowered to enforce California's labor laws, including IWC wage orders.' [Citation.]" (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 [94 Cal.Rptr.2d 3, 995 P.2d 139].) In fact, "Labor Code sections 61 and 1193.5 specifically empower the DLSE to interpret and enforce IWC Orders with the primary objective of protecting workers." (*Bono Enterprises, Inc. v. Bradshaw* (1995) 32 Cal.App.4th 968, 974 [38 Cal.Rptr.2d 549], disapproved on another point in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 574 [59 Cal.Rptr.2d 186, 927 P.2d 296].) Thus, it is clear that "DLSE's interpretation of an IWC order is entitled to great weight . . . ." (*Monzon v. Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16, 30 [273 Cal.Rptr. 615].)

The DLSE has interpreted the exemption for administrative employees in title 8, section 11040, subdivision 1(A), in two advice letters issued on October 5, 1998, and January 7, 1993. Advisory opinions of this sort, " 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' [Citation.]" (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 14.) Thus, in *Morillion v. Royal Packing Co., supra,* 22 Cal.4th at page 584, the court reviewed two DLSE advice letters and found support in the fact that the DLSE interpretation was consistent with its independent analysis.[10] (See also *Tidewater Marine Western, Inc. v. Bradshaw, supra,* 14 Cal.4th at p. 571.)

---

[10]Consistent with *Tidewater Marine Western, Inc. v. Bradshaw, supra,* 14 Cal.4th 557, we do not defer to the DLSE's interpretation of "administrative capacity" in the Operations and Procedures Manual, issued by the DLSE in September 1989. The *Tidewater* decision holds that the manual constitutes a regulation and therefore is void because it was not adopted in

In the advice letter dated October 5, 1998, the DLSE noted that, despite certain differences between state and federal law, "the Division of Labor Standards Enforcement has traditionally followed federal cases and federal regulations, to the extent that such cases and regulations are not inconsistent with state wage and hour provisions, in interpreting and enforcing the various IWC wage orders . . . ." (Cal. Dept. Industrial Relations, DLSE Chief Counsel Miles E. Locker, advice letter, Applicability of the Administrative Exemption to Insurance Company Claims Representatives (Oct. 5, 1998) p. 7.) An earlier advice letter dated January 7, 1993, went further to suggest that the federal regulations are directly applicable to the administrative exemption under state law: "The Department of Labor's regulations discuss the administrative exemption in detail at 29 C.F.R. § 541.201 through § 541.208 and the DLSE *adopts* those definitions." (Cal. Dept. Industrial Relations, DLSE Chief Counsel H. Thomas Cadell, Jr., advice letter, Exempt Employees—"Salary Basis Test" (Jan. 7, 1993) p. 8, italics added.)

Without examining the specific rulings of these advice letters or approving any theory of implied "adoption" by reference to the federal regulations, we view the advice letters as confirming the general conclusion that we earlier reached through a review of the state regulatory history—federal authorities are relevant to interpretation of the term "administrative capacity."

FIE argues that the IWC has rejected "the federal test of exemption" on three occasions by declining to adopt proposals to amend the regulatory exemption along the lines of federal models.[11] But our review of the regulatory history reveals no more than a sufficient degree of parallelism to justify looking to federal law for guidance. The fact that the IWC has on certain occasions rejected proposals for closer patterning of state regulations after federal models does not affect the parallelism that does exist.

Somewhat inconsistently, FIE argues that an absence of parallelism between the exemption provisions of wage order No. 4 and federal law is shown by the fact that, during the pendency of this appeal, the wage order was revised comprehensively, effective June 30, 2000, to more closely

accordance with the Administrative Procedure Act. (Gov. Code, § 11340 et seq.) We regard this holding as also applying to the Enforcement Policies and Interpretations Manual, issued by the agency in October 1998.

[11]FIE cites an IWC ruling dated October 21, 1988, denying a petition of the California Hospital Association dated September 1986; a petition of the California Hospital Association dated February 1981, apparently denied in an unidentified order; and the vote on a motion noted in the minutes of an IWC meeting on March 2 and 3, 1976.

conform to federal regulations.[12] It invokes the principle that " ' "any material change in the language of the original act is presumed to indicate a change in legal rights." ' " (*Dubins v. Regents of University of California* (1994) 25 Cal.App.4th 77, 85 [30 Cal.Rptr.2d 336]), and reasons that, since the regulation is now modeled after federal regulations, it may be inferred that it was not so modeled before the recent amendment. Plaintiffs counter by arguing that the recent revision manifests an intention to clarify preexisting law. (See *Kern v. County of Imperial* (1990) 226 Cal.App.3d 391, 399 [276 Cal.Rptr. 524].) In their view, the amendment confirms the relevance to previous orders of certain specific language in federal regulations ("work directly related to management policies or general business operations . . ."). (29 C.F.R. § 541.2(a)(1) (2000).)

We are reluctant to draw any inference from the recent amendment that is any broader than the circumstances merit. The recent amendment, however, is unquestionably a further instance in which the IWC has drawn on federal law to enact a significant amendment to the exemption provisions of wage order No. 4, following earlier amendments in 1947 and 1957. To the extent that the amendment tends to reveal a continuing IWC policy, it supports the relevance of federal law to interpretation of the administrative exemption.

Our conclusion affirming the relevance of federal law is consistent with a significant body of case law. In *Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 658 [224 Cal.Rptr. 688, 715 P.2d 648], our high court noted, "Federal decisions have frequently guided our interpretation of state labor provisions the language of which parallels that of federal statutes." Court of Appeal decisions add: "Because the California wage and hour laws are modeled to some extent on federal laws, federal cases may provide persuasive guidance." (*Nordquist v. McGraw-Hill Broadcasting Co., supra,* 32 Cal.App.4th at p. 562.) "California courts have recognized that California's wage laws are patterned on federal statutes and that the authorities construing those federal statutes provide persuasive guidance to state courts." (*Monzon v. Schaefer Ambulance Service, Inc., supra,* 224 Cal.App.3d at p. 31; *Hernandez v. Mendoza* (1988) 199 Cal.App.3d 721, 726, fn. 1 [245 Cal.Rptr. 36]; *Alcala v. Western Ag Enterprises* (1986) 182 Cal.App.3d 546, 550 [227 Cal.Rptr. 453].)

In *Bono Enterprises, Inc. v. Bradshaw, supra,* 32 Cal.App.4th at page 976, the court noted an important qualification on the relevance of federal authorities in this area: "the state is empowered to go beyond the federal

---

[12]The amendment was adopted at a public hearing on June 30, 2000. A statement of the basis for the amendment was issued by the IWC on October 1, 2000. (Cal. Dept. Industrial Relations, Statement as to the Basis (Oct. 1, 2000).)

regulations in adopting protective regulations for the benefit of workers. [Citation.] The federal authorities are of little if any assistance in construing state regulations which provide greater protection to workers."

The recent decision in *Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th 785, illustrates these principles. The court began by noting that "[t]he IWC's wage orders, although at times patterned after federal regulations, also sometimes provide greater protection than is provided under federal law in the Fair Labor Standards Act (FLSA) and accompanying federal regulations." (*Id.* at p. 795.) The issue on appeal concerned the definition of the exemption for "outside salesmen." With respect to this matter, state law did in fact provide greater protection for employees than its federal analog. (Compare Lab. Code, § 1171 and CCR, tit. 8, § 11070, subds. 1(B) and 2(I) with 29 C.F.R. §§ 541.5 and 541.505 (2000).) Accordingly, the court held that the trial court erred in relying on federal authorities in construing the wage order: "where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced." (*Ramirez v. Yosemite Water Co., supra,* at p. 798.)[13]

FIE argues that *Morillion v. Royal Packing Co., supra,* 22 Cal.4th 575 expands the holding of *Ramirez* into a rule of presumptive irrelevance of federal authorities in construing wage and hour laws, "[a]bsent convincing evidence of the IWC's intent to adopt the federal standard . . . ." (*Morillion v. Royal Packing Co., supra,* at p. 592.) We do not, however, read *Morillion* as being inconsistent with other precedents relying on the guidance of federal law. The decision concerned the compensable nature of travel time as part of hours worked by agricultural employees. The federal definition of hours worked differed from the state definition by expressly exempting travel time. The court held only that it was error to invoke a differing federal standard to restrict the broader protections available under state law. "In determining how much weight to give federal authority in interpreting a

---

[13]The pertinent differences between the state and federal definitions of the outside salesman exemption related to the required degree of employment in the exempt activity. Title 8, section 11070 employed "a purely quantitative approach, focusing exclusively on whether the individual 'works more than half the working time . . . selling . . . or obtaining orders or contracts.' [Citation.]" (*Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th at p. 797.) Federal law provided a qualitative approach, focusing on the employee's "primary function" (29 C.F.R. § 541.505(a) (2000)), which was potentially more expansive. In footnote 4, the court noted that the exemption for administrative, executive and professional employees presented a similar contrast. (Compare CCR, tit. 8, § 11040, subd. 1(A)(1) ["engaged in work which is primarily"] and subd. 2(K) [" 'Primarily' . . . means more than one-half of the employee's work time"] with 29 C.F.R. §§ 541.1(a), 541.2(a) and 541.3(a) ["primary duty"].) Since the present case does not concern the meaning of these terms, the differences noted by the court have no relevance to our analysis here.

California wage order," the court cautioned, it is necessary first to make a comparative analysis of the two "statutory schemes." (*Id.* at p. 588.)

### 3. *Administrative/Production Worker Dichotomy*

Our analysis thus far has established two very general propositions: first, the statutory context and applicable rules of interpretation suggest that the term "administrative capacities" in subdivision 1(A) of wage order No. 4 (tit. 8, § 11040) should be construed independently of the language in subpart (1) of the subdivision so as to form part of the definition of the administrative exemption, and, second, federal authorities construing parallel provisions of the FLSA are relevant to construing the exemption provisions of wage order No. 4.

Turning to federal interpretative regulations, we observe at the outset distinct criteria addressing the *role* of administrative employees in a business enterprise, the actual *duties* of the employees, and the employees' level of *remuneration.* The so-called short test of administrative employee status— applying to the great majority of employees with weekly remuneration above $250 per week—effectively follows this analytical distinction by directing separate consideration of the employee role as described in 29 C.F.R. part 541.2(a), and the existence of duties "requiring the exercise of discretion and independent judgment."[14] (29 C.F.R. § 541.2(e)(2).) The "long test"—applying only to the extremely limited category of employees with remuneration between $155 and $250 per week—may also be broken into criteria pertaining to employee role and employee duty.[15]

The criteria of administrative capacity in subpart (1) of subdivision 1(A) of title 8, section 11040 address employee duties and level of remuneration. To the extent that the criteria relating to employee duties are parallel to those of federal law, we may look to federal authorities as an aid in their interpretation. But our conclusion that the term "administrative capacities" should be given independent significance inevitably leads also to consideration of the employee role in the business enterprise. If we were not free to inquire into the employee role, the term "administrative capacities" would add nothing significant to the criteria relating to employee duties in subpart (1) of title 8, section 11040, subdivision 1(A); it is only to the

---

[14]For a discussion of the differences between the "short test" and "long test," see *Martin v. Cooper Elec. Supply Co.* (3d Cir. 1991) 940 F.2d 896, 901. In general, the short test in 29 C.F.R. part 541.2(e)(2) is articulated more fully in part 541.214. Both part 541.2(e)(2) and part 541.214 lead directly, or by way of reference, to the meaning of the phrase "work directly related to management policies or general business operations" as defined in part 541.205.

[15]Part 541.2(c)(1), addresses the employee role; the other additional provisions of the "long test" relate to employee duties.

extent that the term "administrative capacities" allows consideration of matters not covered by subpart (1) that it effectively assumes an independent significance. A close reading of the subdivision reveals that it is those matters relating to employee role that are not covered by subpart (1).

We wish to make clear that we do not perceive a degree of parallelism between federal and state law that would make the entire corpus of federal regulations construing the administrative exemption directly applicable to the exemption provision of wage order No. 4. We look to federal law only for insights and a general methodology in construing the term "administrative capacities." With respect to the employee role in the business enterprise, we find such insight and methodology in the administrative/production worker dichotomy on which plaintiffs chiefly relied in their motion for summary adjudication.

Drawing on 29 C.F.R. parts 541.2 and 541.205(a),[16] federal authorities draw a distinction between administrative employees, who are usually described as employees performing work "directly related to management policies or general business operations of his employer or his employer's customers,"[17] and production employees, who have been described as "those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce." (*Dalheim v. KDFW-TV* (5th Cir. 1990) 918 F.2d 1220, 1230.)

Though it offers a broad distinction demanding further refinement in some cases, the administrative/production worker dichotomy, as elucidated by federal decisions, has proven to be a useful approach to construing a statutory term that appears in a closely parallel context in the FLSA and title 8, section 11040. Since the federal decisions employing this dichotomy concern the meaning of a statutory term, they would offer authoritative interpretation of that term even in the absence of the interpretative regulations on point. Nevertheless, to the extent that the dichotomy is linked to the interpretative regulations, it is worth noting that the distinction draws on regulatory language ("directly related to management policies or general

[16]Part 541.205 of 29 C.F.R. defines the phrase in part 541.2, "directly related to management policies or general business operations of his employer or his employer's customers, . . ." The pertinent language in part 541.205(a) is the following: "The phrase 'directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work."

[17]Using a variation on this language of the interpretative regulations, the court in *Martin v. Cooper Elec. Supply Co., supra,* 940 F.2d at page 906, refers to employees "involved directly or indirectly in the determination, administration or implementation of Cooper's management or operational policies."

business operations") that dates back to the earliest federal interpretative regulations and now has a critical place in the definition of the term "administrative" capacity in 29 C.F.R. part 541.2.

When the term "administrative" was added to title 8, former section 11345 in the 1957 amendment, the term had long been defined in 29 C.F.R. part 541.2, subdivision (a)(1), as referring to employees performing work "directly related to management policies or general business operations . . . ."[18] In later revisions and elaborations of the federal regulations, this phrase acquired a more central place in the definition of "administrative" employee in 29 C.F.R. part 541.2, and came to be separately defined in 29 C.F.R. part 541.205. At the time of the summary judgment motion, both the "short" and "long" test of administrative employee status described an administrative employee as one whose "primary duty" consists of the "performance of office or nonmanual work *directly related to management policies or general business operations of his employer* or his employer's customers." (Italics added.)

A leading decision construing the administrative/production worker dichotomy, *Dalheim v. KDFW-TV, supra,* 918 F.2d 1220, addressed a claim of exemption for news producers. Rejecting an argument that the concept of production applies only to manufacturing employees, the court stated, "The distinction § 541.205(a) draws is between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." (*Id.* at p. 1230, fn. omitted.) By this test, the court concluded that the news producers were production employees. (See also *Freeman v. National Broadcasting Co., Inc.* (S.D.N.Y. 1993) 846 F.Supp. 1109, 1154, revd. on other grounds in *Freeman v. National Broadcasting Co., Inc.* (2d Cir. 1996) 80 F.3d 78.)

The decision in *Martin v. Cooper Elec. Supply Co., supra,* 940 F.2d at page 901, underscored "the analytical importance of an administrative/productive work dichotomy . . . ." (Italics omitted.) The principal issue there related to the status of inside salespersons employed by a wholesale electrical supplier. Holding that the inside salespersons were production rather than administrative employees, the court began its analysis by considering " 'the nature of

---

[18]Effective October 15, 1940, 29 C.F.R. part 541.2 provided: "The term 'employee employed in a bona fide administrative capacity' . . . shall mean any employee (a) . . . [with a stated remuneration], and . . . (b) (2) who performs under only general supervision, responsible nonmanual office or field work, *directly related to management policies or general business operations,* . . . (3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks *directly related to management policies or general business operations* . . . ." (Italics added.)

the employer's business.' " (*Id.* at p. 903.) The stipulations of the parties, it found, "reflect the underlying reality of wholesale sales enterprises like Cooper: they aim to produce wholesale sales. It follows that Cooper's inside salespersons may be classified as 'production' rather than 'administrative' employees . . . ." (*Ibid.*, italics omitted.)

Another line of authority has applied the administrative/production distinction to government workers. Holding that deputy probation officers and children's treatment counselors were not within the administrative employee exemption, the court in *Bratt v. County of Los Angeles* (9th Cir. 1990) 912 F.2d 1066, 1070, observed, "The services the Employees provide the courts do not relate to court policy or overall operational management but to the courts' day-to-day production process." (Followed in *Roney v. U.S.* (D.D.C. 1992) 790 F.Supp. 23, 27 [deputy marshals].) Again, in *Reich v. State of New York* (2d Cir. 1993) 3 F.3d 581, 587-588, the court characterized the work of investigators for the New York Bureau of Criminal Investigations as being "squarely on the 'production side' of the line" since their primary function was to conduct the service performed by the bureau—criminal investigations. (See also *Harris v. District of Columbia* (D.D.C. 1990) 741 F.Supp. 254, 262 ["housing inspections . . . are the 'production' of the Housing Inspection Branch."].)

Several federal district court decisions have particular relevance to the present case. In *Reich v. American Intern. Adjustment Co., Inc.* (D.Conn. 1994) 902 F.Supp. 321, 325, the court employed "a production/administrative test" to hold that automobile damage appraisers did not qualify as exempt administrative employees: "AIAC is in the business of resolving damage claims. The appraisers perform the day-to-day activities of the business through their fact finding and damage evaluations. The appraisers do not administer the business of AIAC." Similarly, in *Fleming v. Carpenters/Contractors Cooperation Com.* (S.D.Cal. 1993) 834 F.Supp. 323, 327, the court held that field investigators were "production employees" because they "were engaged in the day-to-day carrying out of CCC's mission of finding and reporting labor law violations committed by contractors on public work projects." (Accord, *Gusdonovich v. Business Information Co.* (W.D.Pa. 1985) 705 F.Supp. 262, 265 ["BIC's business is 'producing' information for its clients, and the plaintiff's duties consisted almost entirely of gathering that 'product' "].)

We find the analysis in *Reich v. Chicago Title Ins. Co.* (D.Kan. 1994) 853 F.Supp. 1325 to be especially instructive. The court examined the duties of the plaintiff escrow closers "to determine whether they carry out Chicago Title's day-to-day operations . . . or whether they administer the business

affairs . . . [of the company]." Finding that escrow closers were engaged in day-to-day operations, the court stated, "Chicago Title is in the escrow closing business, and its . . . status as a title insurer does not alter the fact that escrow closings are a very real product . . . , which it markets and sells separate from . . . its overall title insurance operations." (*Id.* at p. 1330, fn. omitted.)

### 4. *The Motion for Summary Adjudication*

Seeking to place themselves on the production side of the administrative/production worker dichotomy, plaintiffs describe FIE as "the claims handling arm of the 'Farmers Insurance Group of Companies'" and argue that claims representatives perform the service that FIE exists to produce and market. We will review the undisputed evidence on point and then consider the propriety of the remedy of summary adjudication.

By all accounts, FIE performs a specialized function within the Farmers Insurance Group of Companies, having delegated activities normally associated with an insurance business to other related companies. First, it is undisputed that FIE does not carry out the sales activities ordinarily involved in operating an insurance business. As stated in the declaration of an FIE manager, Mickey Shields, submitted in opposition to the motion, "[c]laims representatives do not sell insurance policies, they are not authorized to sell insurance policies and they have no duties with regard to the sale of reinsurance. FIE sells insurance policies through the use of independent contractor agents."

Second, as a reciprocal insurance exchange, FIE is managed by a related company, Farmers Group, Inc., known as the attorney in fact, which performs activities that would normally be included within the executive and administrative functions of a corporation.[19] In its separate statement of disputed and undisputed facts, FIE acknowledges that these functions include "human resources (including compensation and benefits); payroll financial oversight; development of sales and marketing strategy and techniques; development and pricing of insurance products; financial and regulatory auditing; public relations; legal counselling; underwriting; data processing and other non-claims related matters." In the words of an executive of Farmers Group, Inc., Thomas Norman, "Farmers Group, Inc. manages Farmers Insurance Exchange affairs." This testimony is confirmed by undisputed facts showing that claims representatives have no formal advisory role

---

[19]On the management of a reciprocal insurance exchange, see generally Insurance Code section 1300 et seq. and *Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 702-705 [57 Cal.Rptr.2d 798].

in setting FIE's overall claims handling policy and procedures or in managing FIE's business infrastructure, including purchasing, budgeting, and staffing.

Plaintiffs maintain that, in the absence of ordinary sales or managerial functions, "[t]he sole function of FIE's operation is handling claims arising under insurance policies." The statement is well documented by the testimony of FIE managers and executives. For example, Thomas Norman stated unequivocally, "The Farmers Insurance Exchange does not do anything other than the claims function . . . ." Again, a branch claims manager, Stuart Craig, testified that "the mission" of his office is "property claims handling." Approximately half of his staff consists of claims representatives and the other employees provide clerical support and supervision.

We find it particularly significant that FIE performs a substantial amount of claims handling work for other related companies within the Farmers Insurance Group of Companies and is reimbursed for the cost of these services. An FIE executive, Maryann Seltzer, testified that FIE at times provides "claims-related services on policies issued by . . . Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, and approximately eight domestic stock corporations domiciled throughout the United States," such as the Farmers Insurance Company of Oregon, the Farmers Insurance Company of Arizona, and various other companies. Seltzer testified that these related companies do not employ claims representatives in California other than those employed by FIE.

In its opposition to the motion for summary judgment, FIE advances a broader description of both FIE's business functions and the duties of claims representatives. We note, however, that the factual opposition to the motion is based entirely on declarations of the management executives, Seltzer and Shields. To the extent that these declarations are inconsistent with deposition testimony, we are mindful of the principle that statements against interest in depositions are "entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits." (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10].)

With respect to FIE's business functions, the Seltzer declaration maintains: "FIE is in the business of designing, selling and reinsuring insurance policies. Thus, FIE is not in the business of merely 'handling claims' nor is the sole function of FIE's operation the processing of claims arising from insurance policies it insures and reinsures. The function of FIE's business operations after the sale and reinsurance of insurance policies is to protect

the financial and business interests of FIE through the adjustment and settlement of claims made by insureds and third parties."

In this appeal, however, we are concerned only with the business function of the branch claims offices in California where plaintiffs worked. On this point, we consider that the Seltzer declaration fails to create a material issue of fact. Whatever may be the functions performed elsewhere in the FIE organization or within the Farmer's Insurance Group of Companies, a massive amount of evidence in the record, derived from testimony of FIE executives and managers, establishes that the business of the branch claims offices is to handle claims.

Bearing in mind the principle that "[t]he affidavits of the moving party are strictly construed and those of his opponent liberally construed," the Seltzer declaration at most establishes that other, vaguely described business functions are carried out elsewhere in the FIE organization. (*Slobojan v. Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 437 [74 Cal.Rptr. 895, 450 P.2d 271].) It remains undisputed that, in the words of an FIE vice-president, Clinton Gardner, "one of the important components of Farmers operating their business is to adjust claims that are presented." This "important component" of FIE's operation is, beyond any factual controversy, carried out in branch claims offices.

The Shields declaration attacks plaintiffs' assertion that claims representatives in branch claims offices carry out the business function of claims adjustment. The declaration maintains, that besides their duties in "settling claims," claims representatives have a number of other duties: "In addition to settling claims, Claims Representatives must also perform other duties as part of their job, including determining liability, setting and/or recommending reserves, recommending coverage, estimating damage or loss, providing risk advice, identifying subrogation rights, detecting potential fraud, determining whether reservation of rights letters should be sent, and representing the company at mediations, arbitrations and settlement conferences . . . ."

The additional duties described by the Shields' declaration, however, are all associated in some manner with the claims adjusting function. Moreover, the record reveals that, to the extent that these additional duties extend beyond the core tasks of claims adjusting, they involve intermittent and incidental tasks that involve a small part of the claims representatives' time (e.g., coverage issues, attendance at mediations, arbitrations and settlement conferences). The declaration does not rebut other testimony that the claims representatives fully engaged in the work of claims adjusting. As described in plaintiffs' statement of undisputed facts, the bulk of their time is involved

in "investigating and estimating claims, communicating with policy holders and third party claimants about the indemnity value of the claim, filling out numerous forms, performing various other clerical work, such as photocopying and matching mail to files, and with respect to field claims representatives, driving."

Our review of the undisputed evidence places the work of the claims representatives squarely on the production side of the administrative/production worker dichotomy. The undisputed evidence establishes that claims adjusting is the sole mission of the 70 branch claims offices where plaintiffs worked. The claims representatives are fully engaged in performing the day-to-day activities of that important component of the business. (See *Bratt v. County of Los Angeles, supra,* 912 F.2d at p. 1070; *Fleming v. Carpenters/ Contractors Cooperation Com., supra,* 834 F.Supp. at p. 327.)

We turn now to the question whether our conclusion that plaintiffs are production workers justifies the order of summary adjudication. Plaintiffs cite a line of federal decisions that have granted, or affirmed, summary judgments for plaintiffs on a finding that they were production workers within the meaning of the administrative/production worker dichotomy. (*Reich v. State of New York, supra,* 3 F.3d at pp. 585, 589; *Reich v. Chicago Title Ins. Co., supra,* 853 F.Supp. at pp. 1327-1332; *Gusdonovich v. Business Information Co., supra,* 705 F.Supp. at p. 265; *United States Claims Court v. United States* (1992) 26 Cl. Ct. 782, 787-788.)

We recognize that the administrative/production worker dichotomy is a somewhat gross distinction that may not be dispositive in many cases. The federal decisions granting judgment for plaintiffs on the basis of this dichotomy were decided in the context of interpretative regulations that guard against an overly broad application of the distinction. For example, some businesses, such as management consulting firms, may provide services that clearly pertain to business administration, even though they are activities that the businesses exist to produce and market. The federal regulations address such management-related services in 29 C.F.R. parts 541.2(a) and 541.205(a).[20] (See *Piscione v. Ernst & Young, L.L.P.* (7th Cir. 1999) 171 F.3d 527, 540.)

Again, some employees perform specialized functions within the business organization that cannot be readily categorized in terms of the administrative/production worker dichotomy. (See *Haywood v. North American Van*

---

[20]Part 541.2(a)(1) refers to work "directly related to management policies or general business operations . . . [of the] *employer's customers . . . .*" (Italics added.) Part 541.205(a) refers to persons performing work "of substantial importance to the management or operation of . . . [the] *employer's customers.*" (Italics added.)

*Lines, Inc.* (7th Cir. 1997) 121 F.3d 1066 [customer service representative].) Other employees perform jobs involving wide variations in responsibility that may call for finer distinctions than the administrative/production worker dichotomy provides. Claims adjusting may in fact serve as an illustration. A 1940 report of the Wage and Hour Division of the United States Department of Labor entitled "Executive, Administrative, Professional . . . Outside Salesman" Redefined observed, "As another illustration, the term 'claim agent' may cover a great variety of employees. A claim agent who settles claims for damages which in no case amount to more than five or ten dollars obviously performs mere routine work. On the other hand, a claim agent for a large oil company who is given authority to settle claims that amount to several thousand dollars . . . has authority to affect the welfare of his employer in the most substantial degree."[21]

The federal regulations permit the kind of distinctions that are suggested by the Department of Labor report. Part 541.205(c)(5) of 29 C.F.R. places "claim agents and adjusters" in a listing of administrative employees engaged as "advisory specialists and consultants." (See *Haywood v. North American Van Lines, Inc., supra,* 121 F.3d at pp. 1071-1072.) On the other hand, 29 C.F.R. part 541.205(a) limits the exemption to "persons who perform work of substantial importance to the management or operation of the business of his employer," and 29 C.F.R. part 541.205(c)(2) refers to "an inspector for an insurance company" as an example of an employee performing "routine clerical duties."

In the absence of detailed interpretative regulations comparable to those in federal cases, we consider that California courts must use great caution in granting summary judgment or summary adjudication on the basis of such a broad distinction as the administrative/production worker dichotomy. Nevertheless, we are persuaded the trial court properly granted summary adjudication in the present case on the basis of FIE's own characterization of the claims representative's role in the company. The regional claims manual of the Farmers Insurance Group states, "We have made a deliberate decision to vest the responsibility for our operations upon the branch and regional claims managers, and it is necessary that these officials accept this in its full sense. Again, *the actual handling of the routine and unimportant may be delegated, but questions of importance must be decided by the branch claims manager, and at a higher level by the regional claims manager.*" (Italics added.)

Other evidence confirms that the claims representatives in the personal lines division are ordinarily occupied in the routine of processing a large

---

[21]United States Department of Labor, Wage and Hour Division, Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition, "Executive, Administrative, Professional . . . Outside Salesman" Redefined, (Oct. 24, 1940) page 25.

number of small claims. In the case of automobile physical damage claims, the average cost of repair is $3,000 and the average cost of a total loss is $6,000. Only underinsured motorist claims, which account for only about 1 percent of the workload, may average above $20,000. The average costs of other categories of property damage and liability claims range between $2,000 and $8,000. For example, the average cost of residential building damage claims is slightly over $3,000. The claim representatives' authority to settle claims is set at a low level that reflects the small size of most claims. With few exceptions, the representatives' file authority is set at $15,000 or lower and often is $5,000 or lower.

On matters of relatively greater importance, the claims representatives acted as investigators or as conduits of information to supervisors. For example, they were instructed to fill out appropriate forms detailing information that might indicate an unusual risk; the forms were then referred to the underwriting department which would review the decision to renew the insured's policy. Again, they were expected to gather information on subrogation potential, which their supervisors could use in deciding to present a claim to a third party. In the event of litigation, they operated as "go-betweens" in conveying information to the attorney. Similarly, on coverage questions involving interpretation of the policy, they were expected to bring information to the attention of supervisors, who would instruct them what to do.

In short, the record as a whole confirms the accuracy of FIE's own description of the claim representatives' responsibilities as being restricted to "the routine and unimportant." On matters of relatively greater importance, they are engaged only in conveying information to their supervisors—again primarily a "routine and unimportant" role. This characterization of their role in the company places plaintiffs in the sphere of rank and file production workers. More precisely stated, plaintiffs render a service within an important component of the FIE business organization, i.e., the branch claims offices, which this component of the organization exists to produce. Following federal precedents, we hold that this characterization of the plaintiffs' role in the business organization places them clearly outside the category of administrative workers. We therefore conclude that the trial court properly ruled, as a matter of law, that plaintiffs were not employed in "administrative capacities" within the meaning of the language of subdivision 1(A) of wage order No. 4.

Our conclusion obviates the need to inquire into plaintiffs' duties, that is, whether the plaintiffs are "engaged in work which is primarily intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment" within the meaning of subdivision 1(A)(1) of wage order

No. 4 (tit. 8, § 11040) and parallel federal regulations. (Cf. *Martin v. Cooper Elec. Supply Co., supra,* 940 F.2d at p. 907, fn. 10; *Reich v. Chicago Title Ins. Co., supra,* 853 F.Supp. at p. 1329; *Freeman v. National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1154.) Since the term "administrative capacity" imposes an independent requirement of the exemption, our conclusion that claims representatives do not work in an "administrative role" within the FIE business organization is dispositive and establishes their nonexempt status. We reach this conclusion through an analysis of the peculiar nature of FIE's business and the claims representatives' role in that business, while recognizing that a careful analysis of the employees' duties may be necessary to determine exempt or nonexempt status in other cases.

### B.   *Statutory Authority for Interim Award of Attorney Fees*

Having found no error in the decisional underpinning of the award of attorney fees, we proceed to consider whether the applicable statute, Labor Code section 1194,[22] authorizes an interim award of attorney fees.

Labor Code section 1194 is a "one-way" fee-shifting statute, which gives employees the right to recover reasonable attorney fees in a successful suit for overtime compensation, without giving employers any corresponding right in the event of a successful defense of an employee suit. The statute originally conferred on employees only the right to recover costs of suit, but a 1991 amendment added the rights to recover prejudgment interest and reasonable attorney fees. (Stats. 1991, ch. 825, § 2, p. 3666.) As so amended, section 1194, subdivision (a), provides in pertinent part: "any employee receiving less than . . . the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this . . . overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."

As noted in *Earley v. Superior Court, supra,* 79 Cal.App.4th at page 1428, the legislative history of the 1991 amendment of Labor Code section 1194 reveals that it was intended to provide a " 'needed disincentive to violation of minimum wage laws.' (Sen. Rules Com., Analysis of Sen. Bill No. 955 (1991-1992 Reg. Sess.) as amended Sept. 10, 1991 . . . .) An analysis of the bill submitted to the Senate in advance of the vote stated that, '[t]hese additional remedies are especially necessary in situations where the employees themselves pursue a private action to recover unpaid wages or overtime.' (*Ibid.*)" (Italics omitted.)

---

[22]The order granting interim payment of attorney fees, filed April 20, 2000, was based on both Labor Code sections 218.5 and 1194, subdivision (a), but the decision in *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420 [95 Cal.Rptr.2d 57], decided the same day, held that the provisions of section 1194 alone control the award of attorney fees in overtime claim cases. Accepting the holding in the *Earley* decision, plaintiffs base their arguments in this appeal solely on section 1194.

Plaintiffs argue that in complex and protracted litigation, an interim award of attorney fees is needed to carry out the legislative intent of enabling employees to bring suit to recover unpaid overtime compensation. As stated in *James v. Stockham Valves & Fittings Co.* (5th Cir. 1977) 559 F.2d 310, 358-359, "[t]here is a danger that litigants will be discouraged from bringing such suits because of the risks of protracted litigation and the extended financial drain represented by such a risk. An award of interim attorneys' fees will prevent extreme cash-flow problems for plaintiffs and their attorneys." (See also *Marks v. Clarke* (9th Cir. 1996) 102 F.3d 1012, 1034; *Kayes v. Pacific Lumber Co.* (9th Cir. 1995) 51 F.3d 1449; *Carpenter v. Stephen F. Austin State University* (5th Cir. 1983) 706 F.2d 608, 633.)

The present case, plaintiffs argue, presents a risk of imposing "an extended financial drain" on plaintiffs and their counsel, which would exhaust their resources and thereby defeat the legislative purpose underlying Labor Code section 1194. The record indeed reveals the extraordinarily intense and protracted litigation of every step on the way to the orders now on appeal. Since the action was filed on October 2, 1996, plaintiffs' attorneys spent nearly 4,000 hours in litigating a series of seven contested motions before ultimately securing the orders for class certification and summary adjudication. To maintain the litigation, plaintiffs' counsel have been forced to advance costs exceeding $100,000 and to rely on bank loans to defray overhead expenses. The second stage of the litigation could conceivably involve a comparable, or even greater, expenditure of legal effort. FIE filed a status conference statement estimating the length of the trial to be 300 days.

Under these circumstances, the trial court considered that an award of interim fees was required "in order to promote a fair and just outcome" and to address "the mismatch" in financial resources, "exacerbated by the protracted time." We can also see the merit on policy grounds of awarding interim fees in litigation of this kind. American jurisprudence adheres, however, to the rule that each party must bear his or her own attorney fees unless a contractual provision or statute provides otherwise. In the absence of a contractual provision, the right to an award of attorney fees is "purely statutory." (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309, 313 [19 Cal.Rptr. 479, 369 P.2d 7].) As stated in Code of Civil Procedure section 1021, "Except as attorney's fees are *specifically provided for by statute*, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ." (Italics added.) Thus, whatever might best serve the legislative purpose of Labor Code section 1194, the propriety of the interim award of attorney fees depends on whether it was "specifically provided for by statute."

"We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.]" (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Though the term "to recover" has a range of possible meanings, we think that in the context of a civil action it ordinarily denotes the securing of a judgment. As noted in *Taylor v. Forte Hotels International* (1991) 235 Cal.App.3d 1119 [1 Cal.Rptr.2d 189], the narrower legal sense of the term "recovery" means " 'the obtaining [by judgment] of some right or property which has been taken or withheld from him.' [Citation.]" (*Id.*, at p. 1124.)

We therefore read the phrase "to recover in a civil action the unpaid balance of the full amount of . . . overtime compensation" as referring to a recovery by judgment. (Lab. Code, § 1194, subd. (a).) It follows, we think, that the phrase "including interest thereon, reasonable attorney's fees, and costs of suit" has reference to the existence of such a judgment and refers to items included in that judgment. Indeed, the reference to interest and costs of suit can only refer to items awarded in a judgment. Under the principle of *noscitur a sociis*, the reference to attorney fees should be construed by considering it in the context of the clause as a whole. (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1391, fn. 14.) It would be inconsistent with the syntax of the statutory language to construe it as authorizing one kind of prejudgment recovery—attorney fees—and three forms of recovery awarded in a final judgment—unpaid overtime compensation, interest, and costs of suit.

The award of interim attorney fees would present peculiar problems in a statute that conditions the right to recover attorney fees on the plaintiff's recovery, and we find nothing in the language of Labor Code section 1194 providing guidance as to when, and under what conditions, an interim fee may be granted. The most plausible explanation is that the Legislature contemplated only an award following final judgment, governed by familiar statutory procedures and rules of court.

Apparently sensing the awkward dilemmas that would be presented by an interim award, the trial court "specifically reserve[d] jurisdiction over the sums awarded to hold future hearings to consider decrease, increase, refund, or costs, as well as any further adjustments, due to matters currently or prospectively on appellate review." But we are reluctant to attribute to the Legislature an intent to authorize an award of interim fees, subject to

unrestricted adjustment, and even refund, later in the litigation. Such a process would run counter to the principle that, when differing interpretations are possible, " '[i]t is the duty of the courts within the framework of the statutes passed by the Legislature, to interpret the statutes so as to make them workable and reasonable.' " (*Regents of University of California v. Superior Court* (1970) 3 Cal.3d 529, 536-537 [91 Cal.Rptr. 57, 476 P.2d 457].)

As the trial court recognized, the present award is subject to a possible need for future adjustments. Plaintiffs point out that, if the order awarding interim attorney fees is affirmed, the decisional underpinning of the order would apply to later stages of the litigation under the doctrine of the law of the case. But it still remains difficult to project the future course of the litigation. The complaint seeks various forms of relief, including an accounting, injunctive relief, and failure to pay compensation upon employee termination, and the answer raises additional affirmative defenses, which may conceivably still be litigated. Moreover, we note that the order granting the interim award did not entail a review of the order for class certification. A reversal or dramatic modification of this order would potentially affect the determination of a reasonable fee.

In cases of this nature, the support for interim attorney fee awards in California decisional law is entirely confined to cases under Code of Civil Procedure section 1021.5. It is true that several cases under that statute have rejected claims that an award was premature, thereby recognizing the existence or prospect of continuing litigation. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 428 [253 Cal.Rptr. 426, 764 P.2d 278]; *California Trout, Inc. v. Superior Court* (1990) 218 Cal.App.3d 187, 212 [266 Cal.Rptr. 788]; *Bouvia v. County of Los Angeles* (1987) 195 Cal.App.3d 1075, 1080, 1086 [241 Cal.Rptr. 239]; *Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 271 [237 Cal.Rptr. 269]; *Bartling v. Glendale Adventist Medical Center* (1986) 184 Cal.App.3d 97, 102 [228 Cal.Rptr. 847].) But unlike federal decisions under civil rights statutes, the California courts have never explicitly addressed the availability of interim fee awards or articulated standards for granting such awards.

The federal decisions authorizing interim attorney fee awards are predicated in large measure on circumstances and legislative history not present here. In *Bradley v. Richmond School Board* (1974) 416 U.S. 696, 723 [94 S.Ct. 2006, 2022, 40 L.Ed.2d 476], the court noted that school desegregation litigation under the Civil Rights Act of 1964 leads to a series of final orders and "[t]o delay a fee award until the entire litigation is concluded would

work substantial hardship on plaintiffs and their counsel . . . ." Again, in *Hanrahan v. Hampton* (1980) 446 U.S. 754, 756-757 [100 S.Ct. 1987, 1989, 64 L.Ed.2d 670], the court relied on "[t]he legislative history of the Civil Rights Attorney's Fees Awards Act of 1976[, which] indicates that a person may in some circumstances be a 'prevailing party' without having obtained a favorable 'final judgment following a full trial on the merits.' [Citation.]"

Even if we assume that decisions under Code of Civil Procedure section 1021.5 support the award of interim attorney fee awards, these precedents would be doubtful authority for such awards under Labor Code section 1194. Code of Civil Procedure section 1021.5 authorizes an award in an action "which has resulted in the enforcement of an important right affecting the public interest . . . ." An interim ruling may vindicate such an important right even if other aspects of the case later go poorly for the plaintiff. In contrast, the language in section 1194, "entitled to recover in a civil action," points to the conclusion of the case.

Apart from the sphere of private attorney general actions under Code of Civil Procedure section 1021.5, the award of interim attorney fees in California remains a wholly untested and novel concept that is ordinarily barred by explicit statutory language. (E.g., *Harrington v. Goldsmith* (1902) 136 Cal. 168 [68 P. 594]; *Southern Cal. Title Clearing Co. v. Laws* (1969) 2 Cal.App.3d 586, 590-591 [83 Cal.Rptr. 8] [construing Civ. Code, former § 796].) Thus, Civil Code section 1717 specifically identifies attorney fees as "an element of the costs" awarded in the final judgment, and the decisional law under the statute has consistently linked the attorney fee award to "the final outcome" (*Bank of Idaho v. Pine Avenue Associates* (1982) 137 Cal.App.3d 5, 15 [186 Cal.Rptr. 695]) or "the final resolution of the merits of the case." (*Liu v. Moore* (1999) 69 Cal.App.4th 745, 755 [81 Cal.Rptr.2d 807].) With this legislative and decisional background, we do not think it is reasonable to construe Labor Code section 1194 as authorizing interim fees in the absence of a clearer expression of legislative intent.

We decline plaintiffs' invitation to base our decision on the larger legislative purpose of Labor Code section 1194. The pertinent issue is whether the statute authorizes an award of interim attorney fees. The syntax of the statute indicates that the Legislature contemplated an award following a judgment of recovery, concurrent with an award of costs of suit and prejudgment interest. We may not rewrite the statute in ways that are beyond the purview of this expression of legislative intent.

## Disposition

The order granting interim payment of attorney fees is reversed. The parties are to bear their own costs on appeal.

Strankman, P. J., and Stein, J., concurred.

A petition for a rehearing was denied March 29, 2001, and appellant's petition for review by the Supreme Court was denied June 20, 2001. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.