Filed 9/14/15  Cava v. FixNation, Inc. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ELIZABETH A. CAVA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> FIXNATION, INC., <br><br> Defendant and Respondent. | B260516 <br><br> (Los Angeles County <br> Super. Ct. No. BC515798) |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara Marie Scheper, Judge.  Affirmed in part, reversed in part and remanded with instructions.

Marchetti Law, Frank Eric Marchetti for Plaintiff and Appellant.

Epstein Becker & Green, James A. Goodman and Ted A. Gehring for Defendant and Respondent.

## INTRODUCTION

Plaintiff Elizabeth Cava appeals from the trial court's grant of summary judgment in favor of her former employer, FixNation, Inc. The trial court concluded Cava failed to establish any disputed issue of material fact sufficient to defeat summary judgment on her claims for wage and hour violations and wrongful termination in violation of public policy. We affirm summary adjudication on Cava's wrongful termination claim, but reverse with respect to Cava's remaining claims, and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

### A. FixNation

FixNation is a nonprofit corporation that offers free spay and neuter services for feral, stray, and homeless cats. The company "serves to promote and support the community-based, humane method of homeless cat population control known as Trap-Neuter-Return ("TNR"), by offering its veterinary services for free to homeless cat caregivers, providing TNR training, loaning out humane traps, helping caregivers as much as possible, and engaging in public outreach and education efforts." It was founded in 2007 by Karen Myers and Mark Dodge, who serve as Chief Operating Officer and President, respectively.

### B. Cava's Employment

Cava was hired by FixNation in February 2007, after she had worked as a volunteer for CatNippers, another organization run by Myers and Dodge. Myers and Dodge told Cava they "wanted [her] help to run the Trap Neuter Return program" and she accepted a full-time position with an annual salary of $60,000. Cava was given the job title of Director of Caregiver Relations (also variously called "Director of Field Operations" and "Director of TNR Education"), which remained her title throughout her employment at FixNation. She was also initially appointed by Myers and Dodge as a member of FixNation's board of directors, left that position in 2009.[1]

---

[1] It is undisputed that Cava did not attend any meetings as a board member. She contends she never had any board-related duties, held the position "on paper only," and was told by Myers and Dodge in 2009 that they were replacing her on the board. Myers

Cava's job duties remained the same throughout her employment and, according to Cava, largely mirrored the duties she had performed as a volunteer at CatNippers. The record contains two detailed (and largely consistent) descriptions of Cava's regular duties: first, an Excel spreadsheet created by Cava in April 2012 capturing three consecutive days of tasks in 15-minute increments,[2] and second, Cava's breakdown of a typical work day given during her deposition. From 2007 to July 2012, Cava generally arrived at FixNation between 9:00 and 10:00 a.m. Her first task on a typical day was to prepare the traps by transporting them to the training room, lining them with newspaper, checking the locks, and matching each trap with a fresh trap cover. FixNation used a computer database to track the traps it loaned out to the public (about 600 of them), so Cava was also responsible for logging returned traps into the database. Cava spent about an hour per day physically working with the traps and another hour on trap-related data entry.

Next, Cava would update the schedule. She was responsible for handling all of the reservations for surgeries for feral cats, while another employee handled reservations for tame cats. Each morning, she would update the schedule based on reservations that were actually kept (versus "no-shows") and communicate with trappers who needed to schedule or reschedule reservations. Cava spent one to two hours on scheduling tasks each day.

Cava's next task was to screen all incoming applications from potential trappers and enter that information into at least one of several databases.[3] On rare occasions,

---

claims that Cava told them she could not attend board meetings because she was "too busy" and that she resigned from the board in 2009.

[2] This spreadsheet was created in response to an email by Myers, in which she requested that each staff member "outline the duties and tasks that you perform each day" so that FixNation could "better understand all of the duties that need to be accomplished" in order to "reassess our business model and operations."

[3] While other employees and volunteers would help with some of the data entry, Cava claims it was her responsibility to "ensure that the[] databases were accurate" and

Cava would flag a questionable application for Myers to approve or deny. Cava would then communicate with the applicants to schedule them for training. Cava spent one to two hours per day on applications.

Cava's next task was her most time consuming one—she was responsible for responding to all emails and calls from trappers regarding issues including training, reservations, needing a different trap, trapping techniques and tips, and "updates on how they were doing trapping cats." Cava stated that she handled between 60 and 80 emails per day and spent "hours and hours" (even "up to 5-6 hours, depending on volume") on this task.

Cava also conducted training for new trappers twice a week, with each session lasting about an hour. She would show class participants how to operate the traps and how to transport trapped cats, answer questions about trapping techniques, and assign traps on loan from FixNation. She also spent time following up with trappers to get them to return traps they were no longer using.

Finally, Cava was responsible for closing the clinic at the end of the day, which she estimated took about a half hour per day. Cava also spent time less frequently on other tasks, including providing statistical information from FixNation's database to Myers and Dodge on a "weekly, monthly, and quarterly basis" and occasionally giving presentations about trapping feral cats at neighborhood meetings, schools, and conferences.

*C. Complaints to Myers*

According to Cava, she "began to notice inhumane and abusive treatment of the cats by the vet techs" at FixNation in 2010, but until 2012, "there were just a few, occasional incidents." Those incidents increased in "frequency and severity" in early 2012, and Cava "became much more vocal" in her complaints about the issue to Myers. Cava provides no further details about any particular incident until March 2012. In an email sent to Myers and Dodge on March 29, 2012, Cava complained about "repeated

she thus spent time correcting mistakes made by others. Cava estimated that she spent approximately 15 percent of her time on all data entry tasks.

4

rough handling" of cats by FixNation employees, and noted a report in July 2010 that someone had seen "several of the male vet techs . . . slinging cats around." Around the same time, Cava also spoke to Myers regarding an incident witnessed by another employee, who reported that a vet tech "forcefully dragged" an unconscious cat out of a trap with one hand, rather than using both hands to support the cat. Cava also "flagged" her concern to Myers that there was an increase in trappers reporting cats having injuries after leaving the FixNation clinic. Cava claims her complaints were ignored.[4]

### D. Cava's Termination

As noted above, Cava generally started work between 9:00 and 10:00 a.m. However, the clinic opened for check-in for cats scheduled for surgery at 7:00 a.m. Cava admits that she knew Myers "wanted [her] to be at work by 7:00 a.m.," but she "quite frankly was never able to make it in that early." Cava claims that she was unable to arrive by 7:00 a.m. because she often worked late at night and before leaving home each morning she had to care for a large number of cats she had adopted from FixNation. Moreover, she contends that she never handled check-in as part of her duties and that FixNation "accepted" her late arrival without comment or discipline for the majority of her time there. Myers claims that she raised "repeated objections" to Cava's tardiness, but ultimately "tolerated" it over the years because FixNation was a "small, young organization" that "depended on Cava providing her services." Cava did not formally record her hours until May 2012, when Myers told her that FixNation's "accountant and labor lawyer have requested that we start tracking everyone's hours" by punching a time clock. Cava initially resisted, both because she was "not an hourly employee" and

---

[4] During her deposition and in her opposition to summary judgment, Cava also identified the following additional complaints she made to Myers: (1) an incident with vet techs playing a prank by leaving a trail of blood from a fetus bag; (2) two incidents of cats escaping from the clinic in approximately 2008 and 2009; (3) a cat that died in 2011 following surgery, "probably due to a lack of monitoring;" (4) vet techs swearing and acting inappropriately to female employees; (5) copies of pictures in an employee's locker; and (6) an employee's tattoo.

because the punches would not capture work she did from home in the evenings and on weekends. However, at some point, she began to punch in and out from the office.

In June 2012, Hilary Cymoszinski began working at FixNation as Assistant of Operations. According to Myers, Cymoszinski was an employee of another company (Found Animals Foundation) but came to FixNation on "loan" in order to assist Myers when Dodge became "unable to work due to a serious illness."

Also in June 2012, FixNation's non-exempt employees approved switching to an alternative work week schedule, i.e., four days per week (at ten hours per day) instead of five days (at eight hours per day). The new schedule became effective July 11, 2012, with work hours from 7:00 a.m. to 5:30 p.m., Wednesday through Saturday. Cava arrived at work at 8:07 a.m. on July 11, 2012. Cymoszinski met with Cava later that day, and told Cava that she was expected to arrive at 7:00 a.m. on work days to assist with check-in at the clinic. Cava explained why she had difficulty arriving at that time in the morning. Cymoszinski agreed that Cava could arrive by 7:30 a.m. for the remainder of that week (through July 14) and would thereafter be expected to arrive by 7:00 a.m.

Cava arrived at 7:40 a.m. the following day, July 12, 2012. She received a write-up that day signed by Cymoszinski and Myers, stating that it was "critical" that Cava was "here to help with check in" and that "with the recent change to FixNation's hours of operations … working later than 5pm is not as helpful." Cava arrived before 7:30 a.m. the remaining two days of that week. The first day of the following work week, July 18, 2012, Cava arrived at 7:07 a.m., later than the required 7:00 a.m. start time. She arrived between 7:17 and 7:38 a.m. for the remainder of that week and each day the following week, through Saturday, July 28, 2012. Cava did not receive further written or oral communications regarding tardiness from Myers or Cymoszinski until the evening of July 28, 2012, when Myers placed three additional writeups in Cava's inbox. The writeups concerned Cava's late arrivals on July 25 through 27. According to Cava, when Myers delivered the writeups, she said "Liz, just a reminder about showing up on time," but did not otherwise speak to Cava about her tardiness.

6

Cava arrived to work on time the following two work days, August 1 and 2, 2012. She was terminated by Myers and Cymoszinski on August 2, 2012. Myers claims that she and Cymoszinski made the decision to terminate Cava "on or about July 28, 2012," due to Cava's "excessive tardiness." Myers hired Cymoszinski "sometime after Cava's termination" to work full-time at FixNation "on a temporary basis."

*E. Cava's Complaint*

Cava filed her complaint against FixNation on July 19, 2013. Cava's complaint alleges the following causes of action: (1) failure to pay overtime compensation (Labor Code §§ 510, 1194, 1198); (2) waiting time penalties (Labor Code § 203); (3) violation of Labor Code section 226(a); (4) civil penalty for Labor Code violation (Labor Code § 558); (5) unfair business practices (Bus. & Prof. Code §§ 17200 et seq.); (6) conversion (Civil Code § 3336); (7) unjust enrichment (Civil Code § 3426.3); and (8) wrongful termination in violation of public policy. All of Cava's causes of action were premised on her claim that she was improperly classified as an exempt employee under the Labor Code and therefore was never paid overtime wage or provided other benefits to which she was entitled.[5]

*F. Summary Judgment*

*1. FixNation's Motion*

FixNation moved for summary judgment or, in the alternative, summary adjudication. It did not dispute, for the purposes of summary judgment, Cava's claim that she routinely worked over 40 hours per week. Instead, FixNation contended that Cava's wage and hour claims failed because she was properly classified as an exempt

---

[5] Cava filed a First Amended Complaint on October 4, 2013, adding two causes of action for failure to provide meal and rest periods, based on the same allegations. As alleged in the complaint, Cava's eighth cause of action for wrongful termination appeared to be based on the same alleged Labor Code violations; however, as discussed herein, Cava later alleged that she was wrongfully terminated by FixNation in retaliation for her complaints about their treatment of cats. Cava did not specify the statutory provision on which she based her wrongful termination claim (namely, Penal Code section 597, subdivision (a)) until her opposition to summary judgment, but FixNation did not raise a timeliness objection.

7

administrative employee.  FixNation also argued that Cava could not prevail on her wrongful termination claim because none of her complaints at FixNation implicated a public policy, she was legitimately terminated for her tardiness, and her complaints were too remote in time to support a retaliation claim.

### 2. Cava's Opposition

In opposition to FixNation's motion, Cava argued that her daily duties were largely repetitive and routine and did not involve "the management or general business operations of FixNation" and, as such, she was not subject to the administrative exemption under California's wage-and-hour laws.  She did not dispute her tardiness or that she had received writeups on that issue, but she claimed that "Myers and FixNation began taking steps to replace me in May of 2012," by bringing in Cymoszinski—who Ms. Cava was instructed to train "on all aspect[s] of my job"— and by suddenly insisting that Cava arrive at 7:00 a.m. in order to "fabricate an excuse" to fire her.  Cava claimed that FixNation did so in retaliation for her complaints "about FixNation's inhumane treatment of cats."

### 3. Trial Court's Ruling

The trial court held a hearing on FixNation's motion for summary judgment on September 19, 2014, at which Cava's counsel failed to appear.  After hearing argument from FixNation's counsel and noting the "deficiencies" in Cava's opposition, the court granted the motion in its entirety.[6]  Cava's counsel thereafter filed a motion to vacate the order granting summary judgment, claiming that his absence at the hearing was due to car trouble.  The court denied Cava's motion, stating that it had "thoroughly reviewed the moving and opposing papers related to the motion [for summary judgment] and made its ruling based on the merits, not because plaintiff was absent from the hearing."

---

[6] The minute order from the hearing indicates that the court's ruling was "more fully reflected" in the court reporter's transcript and "incorporated by reference herein," and also that the court ruled on FixNation's objections to Cava's declaration by marking on a copy of the document.  Neither the reporter's transcript nor the ruling on any evidentiary objections was included in the record on appeal.

8

The trial court entered judgment for FixNation on October 3, 2014. Cava timely appealed.

## DISCUSSION

### A. Motion for Summary Judgment

#### 1. Standard of review

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action. . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, at p. 850.) The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, at p. 850.)

We review the trial court's grant of summary judgment de novo and decide independently whether the parties have met their respective burdens and whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348; *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 334.)

#### 2. Wage and Hour Claims

All of Cava's causes of action except her eighth are premised on her claim that she was improperly classified as an exempt employee and therefore that FixNation violated California's wage and hour laws in numerous ways, including by failing to pay her overtime and failing to provide her with meal and rest breaks. The sole issue on summary judgment on these claims was whether Cava was an exempt employee. We

9

conclude that FixNation did not meet its burden to establish that Cava was subject to the administrative exemption as a matter of law.

### a. Governing Legal Principles

"In interpreting the scope of an exemption from the state's overtime laws, we begin by reviewing certain basic principles.  First, 'past decisions . . . teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection.' [Citation.]  Thus, under California law, exemptions from statutory mandatory overtime provisions are narrowly construed.  [Citations.]  Moreover, the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption.  [Citation.]"  (*Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785, 794-795.)  Whether Cava was an exempt employee is a mixed question of law and fact, as it involves the application of legal categories.  (*Id.* at p. 794.)

### b. Overtime Pay and the Administrative Exemption

"Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek" is subject to an overtime rate of pay.  (Labor Code § 510, subd. (a).)  However, the California Industrial Welfare Commission (IWC) "may establish exemptions" from overtime compensation requirements "for executive, administrative, and professional employees, provided that the employee is primarily engaged in the duties that meet the test of the exemption, customarily and regularly exercises discretion and independent judgment in performing those duties, and earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment."  (Labor Code § 515, subd. (a).)

Pursuant to the authority granted by section 515 to establish exemptions to the overtime pay provision of section 510, the IWC issued Wage Order 4–2001, applicable to professional, technical, clerical, mechanical, and similar occupations. Included in title 8 of the California Code of Regulations, as section 11040, the wage order provides a five-

10

part test to determine whether the administrative employee exemption applies. The employee must (1) perform "office or non-manual work directly related to management policies or general business operations" of the employer or its customers, (2) "customarily and regularly exercise[] discretion and independent judgment," (3) "perform[] under only general supervision work along specialized or technical lines requiring special training" or "execute[] under only general supervision special assignments and tasks," (4) be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage. (8 Cal. Code Regs., § 11040, subd. 1(A)(2).) Each of these elements must be satisfied to find the employee exempt as an administrative employee.

### c. Application of Exemption

Cava contends that her duties and responsibilities did not include the performance of office or non-manual work directly related to management policies or general business operations of FixNation or its customers, and therefore that FixNation did not meet its burden of proof to establish the administrative exemption. We agree and therefore do not consider the applicability of the remaining elements.

Cava claims that she falls on the production side of the so-called administrative/production worker dichotomy and is therefore not exempt. Federal and California authorities applying this analytical tool "draw a distinction between administrative employees, who are usually described as employees performing work 'directly related to management policies or general business operations of his employer or his employer's customers,' and production employees, who have been described as 'those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce.' (*Dalheim v. KDFW–TV* (5th Cir.1990) 918 F.2d 1220, 1230.)" (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 820 (*Bell*).)[7] In other words, an exempt administrative employee's duties "relate to [the

---

[7] Federal authorities "construing parallel provisions of the FLSA [the federal Fair Labor Standards Act, 29 U.S.C. § 201 et seq.] are relevant to construing the exemption provisions of wage order No. 4." (*Id*. at p. 819; see also 8 Cal. Code Regs., § 11040,

employer's] policy or overall operational management," while a non-exempt employee's duties involve the employer's "day-to-day production process." (*Bratt v. County of Los Angeles* (9th Cir. 1990) 912 F.2d 1066, 1070; see also *Bothell v. Phase Metrics, Inc*. (9th Cir. 2002) 299 F.3d 1120, 1127 [discussing the distinction "between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself'"].)

For example, in *Bell*, *supra*, 87 Cal.App.4th at pp. 825-826, the Court of Appeal affirmed the trial court's ruling that insurance claims representatives were non-exempt production workers, based on the finding that the employees' primary duty of adjusting claims provided a service at the core of the employer's day-to-day business. (See also *Eicher v. Advanced Business Integrators, Inc*. (2007) 151 Cal.App.4th 1363, 1373 [non-exempt employee "engaged in core day to day business" of employer by implementing company's software product and supporting customers].) Similarly, here, Cava's primary duties consisted of, as she put it, "answer[ing] all the calls, all the emails, screen[ing] all the applications, train[ing] people, schedul[ing] people." These duties, which made up the bulk of Cava's daily responsibilities, all involved the day-to-day provision of TNR services that formed the core of FixNation's business.

FixNation contends that Cava's primary responsibility was to "develop and maintain relationships with caregivers" and that job was "critical to the running and servicing of FixNation's business operations" because without caregivers to supply cats, FixNation "would fail to meet its funding requirements and would be unable to survive as an organization." Even assuming that to be true (and Cava did not dispute this characterization of her primary responsibility at her deposition), it does not satisfy FixNation's burden to establish the administrative exemption. Crucially, FixNation fails to point to any *actual* duties that Cava performed that relate to "management policies or general business operations" as opposed to provision of its TNR services. The fact that Cava's work providing TNR services was crucial to FixNation's survival does not change

subd. 1(A)(2)(f) [expressly incorporating the definitions for exempt work contained in 29 C.F.R. sections 541.201-205, among others].)

12

the classification of her duties; otherwise, the same could be said of any employee working on the production of a good or service that was vital to the employer's business and the administration/production distinction would cease to have meaning. Notably, FixNation fails to cite any cases in support of its position on this issue.

FixNation attempts to collapse Cava's routine tasks, such as data entry, handling traps, responding to emails and scheduling trappers, into the purportedly exempt "responsibility of running the 'T' and 'R' aspects of FixNation's TNR program." FixNation cites to 29 C.F.R. section 541.703, which provides that "menial tasks that arise out of exempt duties" are considered to be "directly and closely related to the performance of exempt duties" and therefore also qualify as exempt work. But FixNation does not present any evidence that Cava performed exempt duties; instead, the actual work Cava did on a day-to-day basis was largely comprised of routine tasks. (See 8 Cal. Code of Regs, § 11040, subd. 1(A)(2)(f) ["The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement."].) When asked at her deposition what she did to further her responsibility to develop and maintain caregiver relationships, Cava repeatedly responded with the same duties--she responded to emails, screened applications, trained people, and scheduled people.[8]

FixNation suggests that the administrative/production dichotomy might be ill-suited to capture the finer distinctions necessary to understand the significant role of an employee like Cava in a smaller company. But the definitions contained in the applicable federal regulations, expressly incorporated into Wage Order 4-2001, similarly suggest that Cava's duties were non-exempt. For example, Federal Regulations former part 541.205 (2000) offers examples of exempt work relating to the "administrative operations

---

[8] As such, FixNation's contention that Cava's discussion of her duties in her declaration in opposition to summary judgment was contradictory to her deposition testimony is incorrect.

13

of the business," including "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." (Fed. Regs section 541.205(b) (2000).) On the other hand, bank tellers, "bookkeepers, secretaries, and clerks of various kinds" . . . "are not performing work directly related to management policies or general business operations." (Fed. Regs. section 541.205(c)(1) (2000); see also section 541.205(a) ["The phrase 'directly related to management policies or general business operations of his employer . . .' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work."]) While FixNation points to Cava's work as the "face" of the company when she gave presentations, it has presented no evidence to counter Cava's claim that such engagements made up a small fraction of her weekly duties. The record here suggests, at a minimum, that a triable issue of fact exists that the majority of Cava's time was spent on non-administrative work.

Finally, FixNation points to Cava's job title as a "director," her initial position as a board member, and her own references to herself as a salaried and "management" employee. None of these facts is determinative. (See 29 C.F.R. section 541.2 ["A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."] *Desmond v. PNGI Charles Town Gaming, L.L.C.* (4th Cir. 2009) 564 F.3d 688, 694 [the "critical importance" of an employee's position does not establish the administrative exemption].)

Thus, FixNation has failed to satisfy its burden to establish that Cava was properly classified as an exempt employee and it was not entitled to summary adjudication on Cava's wage and hour claims.

14

### 3. Wrongful Termination in Violation of Public Policy
#### a. Governing Legal Principles

In her eighth cause of action, Cava alleges that FixNation terminated her in retaliation for her complaints to Myers about mistreatment of cats at the FixNation facility, and that termination violated public policy. To analyze a tortious discharge claim, we apply the three-stage burden-shifting test set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (See *Loggins v. Kaiser Permanente Intern.* (2007) 151 Cal.App.4th 1102, 1108-1109; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453.) Plaintiff bears the burden of establishing a prima facie case for retaliation. A plaintiff meets this burden by showing (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) Upon such a showing, the burden shifts to the employer to provide substantial responsive evidence showing a legitimate, non-retaliatory reason for the adverse employment action. (*Ibid.*; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 149.) If the employer produces a legitimate reason, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation. (*Yanowitz*, *supra,* 36 Cal.4th at p. 1042.) The plaintiff must produce "'substantial responsive evidence' that the employer's showing was untrue or pretextual." (*Martin v. Lockheed Missiles & Space Co*. (1994) 29 Cal.App.4th 1718, 1735; *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1156.)

#### b. Prima Facie Case of Wrongful Termination

In order to establish a prima facie case of wrongful termination in violation of public policy, Cava must identify a policy that encompasses the following criteria: "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental." (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 894.)

15

Cava's claim, which is premised on the allegation that she was terminated in retaliation for reporting "inhumane and abusive treatment of cats," must be supported by tethering it to FixNation's violation of a particular statute. (*Green v. Ralee Eng. Co.* (1998) 19 Cal.4th 66, 79, 84 [plaintiff bears burden "to provide the specific statutes and regulations on which he based his claim"]; *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1257 [rejecting plaintiff's "vague charge" of criminal conduct "unaccompanied by citations to specific statutes or constitutional provisions"].) Here, Cava cites to a single statute, Penal Code section 597, subdivision (a), which imposes criminal liability on any person who "maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal." But none of the evidence in the record establishes any violation of that statute by anyone at FixNation. Cava's complaints about "rough handling" of cats do not suggest that any cat was injured as a result and her claim that she received calls from trappers regarding injured cats does not link those complaints with any conduct by any FixNation employee, much less malicious and intentional mistreatment of animals that would rise to the level of criminal behavior covered under Penal Code section 597.

In Cava's briefs on appeal, she also states that she complained about an incident in May 2012 in which a caregiver complained that "someone had cut a diamond shape into the cat's forehead" while the cat was at FixNation. But there is no evidence in the record of any such complaint. The paragraph of her declaration that Cava cites contains no reference to this incident (or any mutilation, for that matter) and although FixNation noted this omission in its responding brief, Cava offered no explanation and continued to cite to the same (nonexistent) evidence in her reply.

Thus, Cava has failed to show that FixNation engaged in any behavior that violated a fundamental public policy and FixNation was entitled to summary adjudication of her wrongful termination claim.

### B. FixNation's Request for Sanctions

FixNation argues that Cava should be subject to sanctions for omitting a "number of key documents" from the record on appeal. This request is denied. FixNation claims

Cava improperly omitted the following documents from the appendix: (1) one page from Cava's deposition; (2) FixNation's reply brief in support of summary judgment (Cava did include the supporting papers filed with FixNation's reply); and (3) two minute orders reflecting the granting of summary judgment and the entry of judgment. The omission of these documents, none of which contain facts material to our consideration of this appeal, does not rise to the level of sanctionable conduct. Nor does FixNation cite to any authority suggesting otherwise.

## DISPOSITION

We reverse the order granting summary judgment in FixNation's favor. Summary adjudication of Cava's eighth cause of action for wrongful termination in violation of public policy is affirmed. Summary adjudication of Cava's remaining claims is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

17